THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ZANGO, INC.,

              Plaintiff,

    v.

KASPERSKY LAB, INC.,

              Defendant.

NO.  07-CV-0807 JCC

DECLARATION OF MICHAEL ROSENBERGER

MICHAEL ROSENBERGER states and declares as follows:

1.      Identity and Competency.  I am one of the attorneys representing plaintiff in this action.  I have personal knowledge of the matters stated herein and I am competent to testify to these matters.

2.      Declaration of Kevin Osborn.  Attached hereto is a true and accurate copy of the Declaration of Kevin Osborn, dated June 1, 2007, and filed in Zango, Inc. v. PC Tools PTY, Ltd., United States District Court for the Western District of Washington, Cause No. 07-CV-0797 JCC.

DECLARATION OF MICHAEL ROSENBERGER - 1
No. 07-CV-0807

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

Dockets.Justia.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 4th day of June, 2007 at Seattle, Washington.


Michael Rosenberger

DECLARATION OF MICHAEL ROSENBERGER - 2
No. 07-CV-0807

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2007, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following

persons:

- J. Ronald Sim
  jrsim@stoel.com

- Maren R. Norton
  mnorton@stoel.com

- Conor F. Farley
  cfarley@hollandhart.com

- Tarek F.M. Saad
  tfsaad@hollandhart.com

Jeffrey I. Tilden, WSBA #12219
Michael Rosenberger, WSBA #17730
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Telephone: 206-467-6477
Facsimile: 206-467-6292
jtilden@gordontilden.com
mrosenberger@gordontilden.com
Attorneys for Plaintiff Zango, Inc.

DECLARATION OF MICHAEL ROSENBERGER - 3
No. 07-CV-0807

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ZANGO, INC.,

Plaintiff,

v.

PC TOOLS PTY, LTD.,

Defendant.

NO. 07-CV-00797 JCC

DECLARATION OF KEVIN OSBORN

KEVIN OSBORN declares under penalty of perjury pursuant to the laws of the State of Washington as follows:

1.    Identity and Competency. My name is Kevin Osborn. I am over the age of 18. I have personal knowledge of the matters stated below and I am competent to testify to these matters.

2.    Zango Employment. I am employed by Zango, Inc. ("Zango") as its Associate General Counsel. Zango's main office is located in Bellevue, Washington. I am one of Zango's two in-house lawyers and part of the company's eight-person Law and Corporate Affairs department. I am responsible for managing all of Zango's litigation activity and its day-to-day compliance-related efforts. I am a member of the bar in Washington and Illinois.

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

3.    Under My Background. I am a 1990 graduate of Northwestern University School of Law in Chicago, Illinois, where I served as Editor-in-Chief of the *Northwestern University Law Review* (1989-90). Following law school, I had the honor of working as a law clerk for two federal judges: The Honorable Marvin E. Aspen (N.D. Ill., Chicago, 1990-92) and The Honorable Betty B. Fletcher (9th Cir., Seattle, 1992-93). Thereafter, I joined the Seattle-based Perkins Coie LLP law firm in 1993, where I became a partner effective January 1, 2000. I left Perkins Coie in June 2005 for Zango, then known as 180solutions, Inc. I have worked at Zango almost exactly two years now.

4.    FTC Contact. Zango received a Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") in September 2005. The nature and scope of the investigation was described in the CID as directed at determining whether "unnamed persons, partnerships or corporations have been or are engaged in the deceptive or unfair use of e-mail, metatags, computer code or programs, or deceptive or unfair practices involving Internet-related goods or services," potentially in violation of FTC Act §§ 5 or 12 (15 U.S.C. §§ 45, 52 (as amended)).

5.    Resolution with FTC. The CID contained both interrogatories and requests for the production of documents. I worked on Zango's response to the CID beginning immediately upon our receipt of that document. That work continued through the FTC's review of over 1.3 million documents produced by Zango, negotiation and resolution of the FTC's investigation via a settlement and consent agreement, and coordination of independent, written reports documenting Zango's compliance with the terms of the consent agreement. Exhibit A hereto is the consent agreement, also available online at the FTC's web site at http://www.ftc.gov/os/caselist/0523130/0523130c4186decisionorder.pdf. At the risk of stating

DECLARATION OF KEVIN OSBORN- 2
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

the obvious, the FTC had the option of declining to reach a settlement with Zango. Its

alternatives included at least the following: litigating its proposed complaint against Zango in

federal court (or elsewhere), up to and including a trial at which it would try to prove its

allegations; or seeking an immediate shut-down of the company via a request for injunctive

relief, whether preliminary or permanent.

6.     FTC Consent Agreement. The FTC consent agreement was not "final" until

March 7, 2007. The wording, however, was agreed upon no later than November 3, 2006

(when the agreement was announced publicly) and did not change thereafter. The key provisions

of Zango's consent agreement with the FTC and the context in which that agreement exists are as

follows.

a.     Post-January 1, 2006 Installation Not at Issue. First, Zango demonstrated

to the FTC that installations of its software occurring on computers on or after January 1,

2006 presented no issues relative to the substantive areas addressed by the FTC in the

consent agreement – namely, that consumers must give express consent for the

installation of the software following clear and conspicuous notice; that ads served by the

software are labeled as such; that channels are provided to enable customer feedback and

complaints (and that adequate responses to those communications are timely made), and

that customers have access to simple and standard uninstallation tools to remove the

software from their computers if they so desire. That January 1, 2006 date is an integral

element of the consent agreement. Exhibit A at 3 (definition of "Legacy program" as

Zango application "installed on a consumer's computer prior to January 1, 2006");

*id.* at 4, § I (Zango may communicate with and cause advertisements to be displayed by

non-legacy program applications – i.e., those installed after January 1, 2006).

DECLARATION OF KEVIN OSBORN- 3
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

b.    Payment.  Zango agreed to a payment to the FTC of $3 million, in three equal installments.  The first such installment payment has been made.

c.    Continuing FTC Authority.  The FTC consent agreement requires Zango to demonstrate that it is in compliance with the agreement.  The consent agreement will terminate no earlier than March 7, 2027, and the FTC may at any time order that Zango submit "a report, in writing, setting forth the manner and form in which they have complied with th[e] order."  A written report as required under the consent agreement was submitted to the FTC on or about May 7, 2007.  *See* May 7, 2007 report attached to Richard Purcell's declaration.

d.    Future Potential Penalties.  The potential substantial monetary penalties for a violation of the consent agreement could result in Zango being unable to continue its business operations, meaning the end of a company started in 1999 and presently employing approximately 230 employees in six offices spread over four countries. The company and its employees understand that remaining in compliance is not a goal, but a mandate.

e.    Compliance Reporting.  The compliance reports required under the consent agreement must be accorded high priority and be prepared by someone granted full and unfettered access to the company's procedures, software code, policies, and employees.  Zango elected to engage Richard Purcell to prepare its compliance reports, and gave him that access.  Mr. Purcell's declaration is part of Zango's moving papers in this matter.  As noted above, attached to his declaration is his May 7, 2007 report as submitted to the FTC.  Exhibit B hereto is Mr. Purcell's December 13, 2006 preliminary report, also as submitted to the FTC.

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

f.    <u>Settlement, Not Admission of Substantive Facts</u>. The consent agreement documents a settlement between Zango and the FTC. The consent agreement specifically and unambiguously notes that "the signing of the agreement is for settlement purposes only and does not constitute an admission by [Zango] that the law has been violated as alleged in [the FTC's draft] complaint, or that any of the facts as alleged in such complaint, other than jurisdictional facts, are true." Exhibit A at 1.

g.    <u>Mr. Edelman's Assessment is Wrong</u>. PC Tools' declarant Ben Edelman fundamentally mischaracterizes the consent agreement in his declaration. For example, at ¶ 38, Mr. Edelman suggests that "the FTC demands disclosure of *all material effects* – crucially including *detriments*." He cites to page 3 of the consent agreement as support for his italicized phrase "all material effects," but that phrase does not appear at page 3 or elsewhere. In fact, the phrase at issue, included at page 3 in the definition of "Express consent," is "the material terms." In other words, Zango is required to provide to potential users of its software, prior to the installation of that software, a clear and prominent disclosure of "the material terms of such software program" apart from the often more comprehensive discussion included in an End User License Agreement. Zango does precisely that.

7.    <u>Zango in Complete Compliance</u>. Mr. Purcell's conclusion – in both of his compliance reports – *is that Zango is in complete compliance with the consent agreement*. That conclusion, from a highly respected computer privacy and security expert who has been given free rein to "look under the hood" at Zango, speaks for itself – and speaks volumes. Mr. Purcell's credentials are set forth in more detail in his declaration and the biographical information attached thereto.

DECLARATION OF KEVIN OSBORN- 5
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

8.    <u>FTC Responded to Comments, Including Those of Mr. Edelman</u>. As noted above, the Zango-FTC settlement and consent agreement was announced publicly on November 3, 2006. By law, a period of public comment then opened to permit receipt and consideration of input from the public, so-called citizen watchdog groups, academics, industry professionals, and others. The FTC received comments, including from PC Tools' declarant Ben Edelman. *See* Exhibit C (attached). The FTC responded to those comments (including specifically those from Mr. Edelman mirroring his litany of alleged "violations" of the consent agreement, ¶¶ 34-41 of his declaration), noting that it had gleaned nothing from that input that suggested the settlement and consent agreement ought to be rescinded, reconsidered, or altered. *See* Exhibit D (March 7, 2007 correspondence from the FTC), also available on the FTC's web site at http://www.ftc.gov/os/caselist/0523130/0523130c4186lettercommenterskowesedelman.pdf.

9.    <u>Zero Negative Feedback from FTC</u>. Nearly six months have passed since the initial Purcell compliance report was submitted to the FTC in December 2006. I am aware of no indication from, or suggestion by, the FTC that it believes Mr. Purcell's compliance reports contain errors or that Zango is, or has ever been, out of compliance with the consent agreement. Given my position at Zango, and my intimate involvement with the CID process from start to present, I have no doubt that I would be aware of any such communication.

10.    <u>FTC On-Site Visit Three Weeks Ago Raises No Issues</u>. Indeed, Zango hosted two Washington, D.C.-based FTC lawyers at its offices in Bellevue on May 10, 2007, for a day of meetings and discussions about the company, its business model, current software distribution practices, and related subjects. One of those lawyers had been closely involved in the CID process. There was no indication during (or after) these meetings on May 7 that the FTC thought Zango to be out of compliance with the consent agreement.

DECLARATION OF KEVIN OSBORN- 6
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

11.    Further <u>Response to Mr. Edelman</u>. The Zango-FTC settlement and consent agreement codified and formalized a resolution of the FTC's September 2005 CID and investigation of the company's practices, but it is inaccurate to say (as Mr. Edelman does in his declaration) that the settlement "required widespread changes to Zango's business practices – including ceasing nonconsensual installations onto users' computers." Edelman Decl. at ¶ 32. Zango cooperated in the investigation from the very start and the consent agreement actually memorializes what Zango in large measure was already doing on its own. Zango <u>did</u> change its business model dramatically, but it had already made the most significant of those changes prior to January 1, 2006 – including a change to its distribution practices that no longer permitted its distribution partners to have access to Zango's software code. That practice all-too-often had resulted in nonconsensual installations of the software despite contractual prohibitions relating to that practice. The changes made by Zango throughout the summer and fall of 2005 are reflected in the consent agreement regarding Zango's post-January 1, 2006 practices, including those relating to software distribution. *See* ¶ 6(a), *supra*.

12.    <u>Edelman Bias</u>. Mr. Edelman's bias against Zango is well-known. His declaration in this matter carefully limits the specific discussion of his paid "expert" experience to those matters in which he provided oral testimony. Conveniently, that permits him to omit reference to his "expert" services rendered on behalf of putative class action plaintiffs against Zango in a case mentioned in passing in the TRO Opposition (at 2) and in Mr. Saad's declaration (at Exhibit 2). That matter, *Simios v. 180solutions, Inc.*, Case No. 05 C 5235 (N.D. Ill., filed Sept. 13, 2005), was dismissed – with prejudice – when it became clear that the primary putative class representative *had never had Zango/180solutions software installed on his computer.* One might have expected the putative plaintiffs' expert to have inspected the computer on which claims of

DECLARATION OF KEVIN OSBORN- 7
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

nonconsensual installation of Zango/180solutions software were based, but in this instance it appears that inspection by Mr. Edelman either never occurred or he was unable to actually make the requisite identification. In any event, in an after-the-fact declaration he was reduced to confessing that he relied on the *putative plaintiff's* description of having *removed* the software and on certain alleged indicators supposedly *consistent with* said removal. The case was dismissed, with prejudice. Mr. Edelman does not list that matter prominently, his most significant prior Zango contact, in his marketing materials or biographical sketch.

I declare under penalty of perjury pursuant to the laws of the State of Washington that the foregoing is true and correct.

DATED this 1st day of June, 2007, at Bellevue, Washington.

_____
Kevin Osborn

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2007, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following

persons:

- J. Ronald Sim
  jrsim@stoel.com

- Maren R. Norton
  mnorton@stoel.com

- Conor F. Farley
  cfarley@hollandhart.com

- Tarek F.M. Saad
  tfsaad@hollandhart.com

/s/
_____
Jeffrey I. Tilden, WSBA #12219
Michael Rosenberger, WSBA #17730
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Telephone: 206-467-6477
Facsimile: 206-467-6292
jtilden@gordontilden.com
mrosenberger@gordontilden.com
Attorneys for Plaintiff Zango, Inc.

DECLARATION OF KEVIN OSBORN- 8
No. 07-cv-00797

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

052 3130

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION

COMMISSIONERS:    Deborah Platt Majoras, Chairman
                  Pamela Jones Harbour
                  Jon Leibowitz
                  William E. Kovacic
                  J. Thomas Rosch

---

In the Matter of

ZANGO, INC. f/k/a 180SOLUTIONS,
INC.,
    a corporation,

KEITH SMITH,                                    DOCKET NO. C-4186
    individually and
    as an officer of the corporation, and

DANIEL TODD,
    individually and
    as an officer of the corporation.

---

## DECISION AND ORDER

The Federal Trade Commission having initiated an investigation of certain acts and practices of the Respondents named in the caption hereof, and the Respondents having been furnished thereafter with a copy of a draft of complaint which the Bureau of Consumer Protection proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge the Respondents with violation of the Federal Trade Commission Act; and

The Respondents, their attorneys, and counsel for the Commission having thereafter executed an agreement containing a consent order, an admission by the Respondents of all the jurisdictional facts set forth in the aforesaid draft complaint, a statement that the signing of the agreement is for settlement purposes only and does not constitute an admission by the Respondents that the law has been violated as alleged in such complaint, or that any of the facts as alleged in such complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it had reason to believe that the Respondents have violated the Act, and that complaint should issue

Exhibit _A_ Page _9_

stating its charges in that respect, and having thereupon accepted the executed consent agreement and placed such agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, and having duly considered the comments received from interested persons pursuant to section 2.34 of its Rules, now in further conformity with the procedure prescribed in § 2.34 of its Rules, the Commission hereby issues its complaint, makes the following jurisdictional findings, and enters the following order:

1.      Respondent Zango, Inc. f/k/a 180solutions Inc. is a Washington corporation with its principal place of business located at 3600 136th Place SE, Bellevue, Washington 98006.

2.      Respondent Keith Smith is a founder and officer of the corporate Respondent. Individually or in concert with others, he formulates, directs, controls, or participates in the policies, acts, or practices of the corporation, including the acts and practices alleged in the draft complaint. His principal office or place of business is the same as that of Zango, Inc. f/k/a 180solutions, Inc.

3.      Respondent Daniel Todd is a founder and officer of the corporate Respondent. Individually or in concert with others, he formulates, directs, controls, or participates in the policies, acts, or practices of the corporation, including the acts and practices alleged in the draft complaint. His principal office or place of business is the same as that of Zango, Inc. f/k/a 180solutions, Inc.

4.      The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the Respondents, and the proceeding is in the public interest.

## ORDER

## DEFINITIONS

For purposes of this order, the following definitions shall apply:

1.      Unless otherwise specified, "Respondents" means Zango, Inc. f/k/a 180solutions, Inc., its successors and assigns, and their officers; Keith Smith, individually and as an officer of the corporation; and Daniel Todd, individually and as an officer of the corporation; and each of the above's agents, representatives, and employees.

2.      "Affiliate program" means any program whereby any person or entity agrees to disseminate, distribute, or download any software program or application onto consumers' computers, on behalf of Respondents.

3.      "Affiliate" means any person or entity who participates in an affiliate program.

Exhibit __A__ Page __10__

4.      "Assist others" means knowingly providing any of the following services to any person or entity: (a) developing, supplying, distributing, or publishing any software program, product, or service; or (b) formulating, developing, or providing, or arranging for the formulation, development, or provision of, any Internet advertising or marketing content for any person or entity; or (c) performing advertising or marketing services of any kind for any person or entity.

5.      "Clear(ly) and prominent(ly)" shall mean that, in an electronic medium, the disclosure shall be: (a) unavoidable; (b) of a size and shade, and shall appear on the screen for a duration, sufficient for an ordinary consumer to read and comprehend it; (c) in understandable language and syntax; and (d) additionally, in connection with each advertisement or promotion for the download or installation of any software program or application, shall be presented on the principal screen or landing page of each advertisement or promotion, and prior to the consumer downloading or installing such software program or application. Nothing contrary to, inconsistent with, or in mitigation of the disclosure shall be used in any advertisement or promotion.

6.      "Commerce" means as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44.

7.      "Express consent" shall mean that, prior to downloading or installing any software program or application to consumers' computers: (a) Respondents clearly and prominently disclose the material terms of such software program or application prior to the display of, and separate from, any final End User License Agreement; and (b) consumers indicate assent to download or install such software program or application by clicking on a button that is labeled to convey that it will activate the download or installation, or by taking a substantially similar action.

8.      A "security vulnerability" is a weakness, flaw, or bug in a software program or application that can be used to increase access privileges to a computer system, compromise data stored on it, or control its operation.

9.      "Legacy program" shall mean any software program that: (a) is owned or controlled by Respondents; and (b) was installed on a consumer's computer prior to January 1, 2006.

10.     The "World Wide Web" or the "Web" is a system used on the Internet for cross-referencing and retrieving information. Documents ("webpages" or "websites") on the World Wide Web are most frequently formatted in a language called HTML or HyperText Markup Language, that supports links to other documents on the World Wide Web.

11.     A "website" is a set of electronic files or documents, usually a home page and subordinate pages, readily viewable on a computer by anyone with access to the Web and standard Internet browser software.

Exhibit A  Page 11

12.    A "web browser" is a software application used to view, download, upload, surf, or otherwise access documents ("webpage(s)" or "website(s)") on the World Wide Web. Web browsers read coded documents that reside on servers, and interpret the coding into what users see rendered as a webpage or website. A user may retrieve and view a webpage or website by entering the Uniform Resource Locator ("URL") or domain name of the webpage in the address bar of the web browser.

I.

IT IS ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, shall not use any legacy program to display any advertisement to, or otherwise communicate with, a consumer's computer. The provisions of Part I do not apply to any software program or application that was owned or controlled by Hotbar, Inc.

II.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, shall not publish, disseminate, or distribute or assist others in publishing, disseminating, or distributing, on or through the Internet, the World Wide Web, any bulletin board system, File Transfer Protocol ("FTP"), electronic-mail, instant message, webpage, or website in or affecting commerce, any software script, code, or other content in order to exploit a security vulnerability of any computer operating system, web browser, or other application to download or install onto any computer any software code, program, or content.

III.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any goods or services on or through the Internet, the World Wide Web, or any webpage or website in or affecting commerce, shall not install or download, or assist others in installing or downloading, any software program or application without express consent.

IV.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any goods or services on or through the Internet, the World Wide Web, or any webpage or website in or affecting commerce, shall: (1) establish, implement, and maintain a functioning email address or other Internet-based mechanism for consumers to report complaints regarding Respondents' practices;

(2) conspicuously disclose the existence of such reporting mechanism on Respondents' websites; (3) use best efforts to associate each such complaint correctly with the software, application, website, or good or service that is the subject of the complaint; and (4) receive and respond to such complaints, whether received directly or indirectly, in a timely manner via email or other Internet-based mechanism.

V.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any goods or services on or through the Internet, the World Wide Web, or any webpage or website in or affecting commerce, shall establish, implement, and thereafter maintain, a comprehensive program that is reasonably designed to ensure that affiliates obtain express consent before installing Respondents' software program or application onto consumers' computers. Such measures shall include, at a minimum and without limitation, the following:

A.  Obtain contact information from any prospective participant in any affiliate program. In the case of a natural person, Respondents shall obtain the prospective participant's first and last name, physical address, country, telephone number, email address, and complete bank account information as to where payments are to be made. In the case of corporations, partnerships, proprietorships, limited liability companies, organizations, associations, cooperatives, agencies, or other legal entities, Respondents shall obtain the first and last name, physical address, country, telephone number, and email address for the natural person who owns, manages, or controls the prospective participant, and complete bank account information as to where payments are to be made;

B.  Prior to any such prospective participant's acceptance into any affiliate program, (1) provide each such person a copy of this order; (2) obtain from each such person a signed and dated statement acknowledging receipt of this order and expressly agreeing to comply with this order; and (3) provide written notice that engaging in acts or practices prohibited by this order will result in immediate termination of any affiliate program account and forfeiture of all monies earned or owed. Any electronic signature that Respondents obtain pursuant to this Part must comply with the signature requirements of the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), 15 U.S.C. § 7001 *et seq.*;

C.  Require each affiliate to: (1) provide identifying information to Respondents, including the same types of information as required by Subpart A of this Part, concerning that affiliate's sub-affiliates, employees, agents, or sub-contractors who download or install any software program or application onto consumers' computers on Respondents' behalf; (2) provide each such person with a copy of

this order; and (3) obtain from each such person a signed and dated statement acknowledging receipt of this order and expressly agreeing to comply with this order. The identifying information referred to herein shall be required prior to that affiliate's participation in Respondents' affiliate program or immediately after any change to that affiliate's sub-affiliates, employees, agents or sub-contractors;

D.    In accord with Part IV above: (1) establish, implement, and maintain a functioning email address or other Internet-based mechanism for consumers to report complaints to Respondents regarding the practices of any affiliate; (2) clearly and prominently disclose the existence of such reporting mechanism on Respondents' websites; (3) use best efforts to associate each such complaint correctly with the affiliate that is the subject of the complaint; and (4) receive and respond to such complaints, whether received directly or indirectly, in a timely manner via email or other Internet-based mechanism; and

E.    Promptly and completely investigate any complaints that the Respondents receive through Subpart D of this Part or any other source to determine whether any such affiliate is engaging in acts or practices prohibited by this order;

F.    Following completion of the investigation required by Part V(E) above: (1) immediately terminate any affiliate that Respondents reasonably conclude has engaged or is engaging, directly or indirectly, in acts or practices prohibited by this order and cease payments to any such affiliate; and thereafter (2) immediately cease the display of any advertisements to, or otherwise using the software program or application to communicate with, any consumer's computer that received Respondents' software program or application through the prohibited acts or practices of such affiliate, except that Respondents may remove or assist consumers in the removal of Respondents' software program or application. Notwithstanding the foregoing, Respondents may send a notice to the affected consumers' computers that clearly and prominently states: (a) that the software program or application may have been installed on their computer without their consent; (b) that they will no longer receive any advertising or communication from Respondents; and (c) how they can remove all vestiges of the software program or application from their computers. The foregoing notice may not be served more than one (1) time to any computer on which a software program or application was installed and must be served within five (5) days after the termination of the affiliate.

*Provided, however,* that this Part does not authorize or require Respondents to take any action that violates any federal, state, or local law.

Page 6 of 11

Exhibit A Page 14

## VI.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, in connection with the service of any advertisement served or caused by Respondents' software program or application installed on consumers' computers in or affecting commerce, shall in each such advertisement clearly and prominently: (1) identify the program causing the display of such advertisement, together with language specifying that the advertisement is served by such program; (2) provide a hyperlink or other similar technology directly linking to a webpage that provides clear and prominent instructions for (a) uninstalling Respondents' software or other application through which consumers received such advertisement; and (b) accessing Respondents' complaint mechanism as required by Part IV above. Such hyperlink shall be clearly named to indicate these functions.

## VII.

IT IS FURTHER ORDERED that Respondents, directly or through any person, corporation, subsidiary, division, affiliate, or other device, shall not install or cause to be installed on consumers' computers any software program or application in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any goods or services on or through the Internet, the World Wide Web, or any webpage, or website, in or affecting commerce unless Respondents provide a reasonable and effective means for consumers to uninstall the software or application, either through the computers' operating system Add/Remove utility, or other uninstall tool that can be readily located on consumers' computers. Respondents shall not require consumers to: access any website or download or install any additional software program or application; close or deactivate third-party firewalls, operating system firewalls, anti-spyware or anti-adware software, or virus protection software; or provide personally identifiable information in order to complete the uninstall.

## VIII.

IT IS FURTHER ORDERED that, for a period of five (5) years after the date of issuance of this order, Respondents shall maintain, and upon request make available to the Federal Trade Commission for inspection and copying, a print or electronic copy of each document relating to compliance with the terms and provisions of this order, including but not limited to: all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, whether prepared by or on behalf of Respondents, relating to such compliance; and all documents, whether prepared by or on behalf of Respondents, that contradict, qualify, or call into question Respondents' compliance with this order.

Page 7 of 11

Exhibit __A__ Page __15__

IX.

IT IS FURTHER ORDERED that Respondents shall pay to the Federal Trade
Commission the sum of three million dollars ($3,000,000.00). This payment shall be made in the
following manner:

A.  The payment shall be made by wire transfer or certified or cashier's check made
    payable to the Federal Trade Commission in three installments as follows:

    1.  One million dollars ($1,000,000.00) no later than ten (10) days after the
        date of issuance of this order;

    2.  One million dollars ($1,000,000.00) no later than six (6) months after the
        date of issuance of this order; and

    3.  One million dollars ($1,000,000.00) no later than twelve (12) months after
        the date of issuance of this order.

B.  In the event of any default in payment, which default continues for ten (10) days
    beyond the due date of payment, the amount due, together with interest, as
    computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of
    payment, shall immediately become due and payable to the Commission.
    Respondents agree that, in such event, the facts as alleged in the complaint shall
    be taken as true in any subsequent litigation filed by the Commission to enforce
    its rights pursuant to this order, including but not limited to a nondischargeability
    complaint in any subsequent bankruptcy proceeding.

C.  All funds paid pursuant to this Part, together with any accrued interest, shall be
    used by the Commission in its sole discretion to provide such relief as it
    determines to be reasonably related to Respondents' practices alleged in the
    complaint, and to pay any attendant costs of administration. Such relief may
    include, but shall not be limited to, the rescission of contracts, payment of
    damages, and/or public notification respecting such unfair or deceptive practices.
    If the Commission determines, in its sole discretion, that such relief is wholly or
    partially impractical, any funds not so used shall be paid to the United States
    Treasury. Respondents shall be notified as to how the funds are distributed but
    shall have no right to contest the manner of distribution chosen by the
    Commission. No portion of the payment as herein provided shall be deemed a
    payment of any fine, penalty, or punitive assessment.

Page 8 of 11

Exhibit A Page 16

D.    Respondents shall make no claim to or demand for the return of the funds, directly or indirectly, through counsel or otherwise; and in the event of Respondents' bankruptcy, Respondents acknowledge that the funds are not part of the debtor's estate, nor does the estate have any claim or interest therein.

## X.

IT IS FURTHER ORDERED that Respondents shall, in connection with this action or any subsequent investigations related to or associated with the transactions or occurrences that are the subject of the Complaint, cooperate in good faith with the Commission and appear, or cause their officers, employees, representatives, or agents to appear, at such places and times as the Commission shall reasonably request, after written notice, for interviews, conferences, pretrial discovery, review of documents, and for such other matters as may be reasonably requested by the Commission. If requested in writing by the Commission, Respondents shall appear, or cause their officers, employees, representatives, or agents to appear, and provide truthful testimony in any trial, deposition, or other proceeding related to or associated with the transactions or occurrences that are the subject of the Complaint, without the service of a subpoena.

## XI.

IT IS FURTHER ORDERED that Respondent Zango, Inc. f/k/a 180solutions, Inc., its successors and assigns, and Respondents Keith Smith, and Daniel Todd shall delivery a copy of this order to all current and future principals, officers, directors, and managers, and to all current and future employees, agents, and representatives having responsibilities with respect to the subject matter of this order. Respondents shall deliver this order to current personnel within thirty (30) days after the date of service of the order, and to future personnel within thirty (30) days after the person assumes such position or responsibilities.

## XII.

IT IS FURTHER ORDERED that Respondent Zango, Inc. f/k/a 180solutions, Inc., its successors and assigns, shall notify the Commission at least thirty (30) days prior to any change in the corporation that may affect compliance obligations arising under this order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor corporation; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this order; the proposed filing of a bankruptcy petition; or a change in the corporate name or address. *Provided, however,* that with respect to any proposed change in the corporation about which Respondent learns less than thirty (30) days prior to the date such action is to take place, Respondent shall notify the Commission as soon as is practicable after obtaining such knowledge. All notices required by this Part shall

be sent by certified mail to the Associate Director, Division of Enforcement, Bureau of
Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave., N.W., Washington,
D.C. 20580.

## XIII.

IT IS FURTHER ORDERED that Respondents Keith Smith and Daniel Todd, for a
period of ten (10) years after the date of issuance of this order, each shall notify the Commission
of the discontinuance of his current business or employment, or of his affiliation with any new
business or employment. The notice shall include Respondent's new business address and
telephone number and a description of the nature of the business or employment and his duties
and responsibilities. All notices required by this Part shall be sent by certified mail to the
Associate Director, Division of Enforcement, Bureau of Consumer Protection, Federal Trade
Commission, 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

## XIV.

IT IS FURTHER ORDERED that Respondent Zango, Inc. f/k/a 180solutions, Inc., its
successors and assigns, and Respondents Keith Smith and Daniel Todd shall, within sixty (60)
days after service of this order, and at such other times as the Federal Trade Commission may
require, file with the Commission a report, in writing, setting forth the manner and form in which
they have complied with this order.

## XV.

This order will terminate on March 7, 2027, or twenty (20) years from the most recent
date that the United States or the Federal Trade Commission files a complaint (with or without
an accompanying consent decree) in federal court alleging any violation of the order, whichever
comes later; *provided, however*, that the filing of such a complaint will not affect the duration of:

- A.    Any Part in this order that terminates in less than twenty (20) years;

- B.    This order's application to any Respondent that is not named as a defendant in
  such complaint; and

- C.    This order if such complaint is filed after the order has terminated pursuant to this
  Part.

*Provided, further,* that if such complaint is dismissed or a federal court rules that the Respondent
did not violate any provision of the order, and the dismissal or ruling is either not appealed or
upheld on appeal, then the order will terminate according to this Part as though the complaint had

Exhibit A Page 18

never been filed, except that this order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

Donald S. Clark
Secretary

SEAL:
ISSUED: March 7, 2007

Exhibit A Page 19



A division of *Three Forts, LLC*

# ZANGO COMPLIANCE REVIEW

## FTC ORDER COMPLIANCE

PREPARED BY: CORPORATE PRIVACY GROUP

AUTHOR: RICHARD PURCELL

13 DECEMBER 2006

©CORPORATE PRIVACY GROUP

ZANGO COMPLIANCE REVIEW

FTC ORDER COMPLIANCE

## COMPLIANCE REVIEW SCOPE

On 03 November 2006, Zango and the Federal Trade Commission settled charges related to Zango's software distribution practices. The order goes into effect after a Commission review, scheduled for 30 days or more after the settlement date. The agreement includes fifteen (15) sections of requirements. Zango hired Corporate Privacy Group (CPG) to oversee their compliance with the order; this report provides a review of that compliance effort to date.

The scope of the review and this report includes a sub-set of the agreement's requirements. The report covers Zango's compliance in several of the agreement's sections, including:

- Section I – no use of legacy programs to display advertising or communicate with a user's computer
- Section II – no use of security vulnerabilities to download or install software code, programs or content
- Section III – no installation of any software program or application without express consent
- Section IV – deployment and disclosure of a working customer complaint channel, linkage of complaints to correct software cause and prompt response to all complaints
- Section V – ensure that affiliates obtain express consent prior to any Zango software program or application, including identifying accountable persons in affiliate organizations, informing affiliates of program requirements, tracking all down-stream affiliate relationships, managing working complaint channels, promptly responding to complaints, and terminating those in breach of requirements
- Section VI – label all advertising served by program or applications to identify the source program spawning the advertising and the customer complaint channel, including links to instructions for program uninstall
- Section VII – make application removal procedures easy to find and use; make the procedure itself effective in removing the program without changing user computer settings or transferring personal information

The other sections of the agreement deal with additional requirements, including record keeping, fines, responsiveness, disclosure, change notification, and duration of the requirements. This report does not include these sections, as they primarily require future actions.

## SUMMARY

We find Zango in compliance with the requirements detailed in the sections of the agreement noted above.

We note that Zango currently deploys two versions of their User Consent Interface (UCI) that are materially the same, though with slight visual differences. Both forms have identical text

and the use of the two forms has no material affect on our conclusion regarding compliance with the terms of the agreement.

## NOTICE & DISCLOSURE

A primary purpose of the FTC agreement is to establish clear and conspicuous notice to consumers about the consequences of installing software applications onto their computers. Although no specific section details this requirement, it is included in definition #'s five (5) (clearly and prominently) and seven (7) (express consent). Zango has developed, implemented and deployed user notification for all of its software downloads that is unavoidable, explains in plain language that the application serves advertising, how it is served and how often, and how to remove the program. The notices also provide links to more information about the applications, Zango's privacy policy and frequently asked questions. The notice also presents the End User License Agreement in part, with scrolling capability to display more.

Because older (legacy) versions of the Zango application may have presented minimal or even no Notice, Zango must also cease all communications with consumers who have applications installed prior to January 2006. Zango has implemented a plan to cease all such communications. They have also made efforts to upgrade customers to the most current version of their software to assure that all consumers have the same Disclosure experience.

### FINDING

After thorough testing of the Zango.com site, during which we went through hundreds (out of thousands) of downloads, we found all instances of downloads, whether games, video's, utilities or screensavers to show one of two versions of the same disclosure screen.

We also tested several Zango partner sites, again examining the user experience to determine compliance with the "clear(ly) and prominent(ly)" disclosure requirements. We tested a number of partner sites, including:

- www.cheatgenius.co.uk
- www.1UO.net
- www.joblo.com
- www.newgrounds.com

We find that Zango complies with the Notice requirements required by the definition and under Section III of the agreement.

In addition, we have reviewed legacy installations of Zango software and found that Zango servers no longer communicate with or serve advertising to applications installed prior to January 2006. Therefore, we find that Zango is compliant with Section I of the agreement.

## ADVERTISING NOTICE

In addition to disclosures prior to downloading and installing the Zango client software, the agreement requires clear labeling of all advertising served by the application, disclosing the application promoting the advertising and identifying the publisher. To this end, Zango clearly labels advertisements to show that the Zango application is responsible for the ad; additionally, a the label displays a link that takes the user to the Zango Web site for more information, frequently asked questions, and instructions for removing the application.

Exhibit B   Page 22

In our testing, we found that, in rare cases, user intervention might remove ad labels from displayed advertising. This is a known anomaly requiring an ad that renders slowly and quick action by the user.

When serving advertising, Zango servers first post a browser window and frame to the user's computer. The advertiser sequentially and immediately serves the advertising content. In the vast majority of cases, the frame, ad label and advertising content appear to render simultaneously. However, when the ad content renders slowly, the browser window displays the Zango ad label framing a blank space. While the window is blank, if the user clicks on the white space or changes the boundaries of the browser window, the ad label may be removed. The latent advertising content may then display in a framed window with no ad label. This is a known condition caused by Zango's appropriate response to user interaction with advertising windows.

## FINDING

Despite the ability of users to remove ad labels by intervening with slow-rendering ads, we find Zango complies with Section VI of the agreement. We base our conclusion on the fact that the ad label is delivered as a component of the browser window and does display, albeit briefly, prior to being removed due to user intervention with the browser window. We also note that this condition is rare and requires several factors to coincide, including slow-rendering ad content combined with quick action by the user.

## EXPRESS CONSENT

Related to the requirement for Notice, the FTC agreement requires that Zango receive explicit (or express) consent from consumers prior to downloading and/or installing their software on the users' machines. Through our testing of the Zango.com site and downloads, we found a consistent and ubiquitous deployment of user consent mechanisms that required an explicit action by individuals prior to any download or installation routines. Despite some minor differences in the two screens deployed, their actions are identical and unmistakably designed to gain express consent from users.

## FINDING

Our tests of the Zango downloads showed that they are compliant with Section III of the agreement.

## SECURITY EXPLOITS

The agreement makes clear that Zango cannot utilize exploits of known, unknown, or newly discovered vulnerabilities in software code to install their software. We have never received information accusing Zango of directly utilizing these exploits. There have been charges that unscrupulous affiliates may have bypassed computer security barriers to install Zango software silently.

Nevertheless, we have interviewed the security staff at Zango, along with many of the technical staff, to investigate their responsiveness to identifying security exploits and correcting any deficiencies in their code base to prevent hacks, work-arounds, and other non-compliant actions.

Exhibit B Page 23

### FINDING

We find that Zango has reasonable protections for preventing the use of security vulnerabilities in aiding their installation. Zango deploys security resources to detect and mitigate security vulnerabilities in their code base, infrastructure and Web environment. Combined with the robust user Notice and Consent provisions noted above, we find that Zango is compliant with the requirements of Section II of the agreement.

## CUSTOMER COMPLAINT CHANNEL

By definition, spyware loads silently and provides no remedy or help to the user to understand the applications function or to remove it from the computer. Adware, often lumped into the same category, has also been a platform for neglecting the consumers concern for control over their personal computers. Zango has had a working customer inquiry and complaint channel for some time, striving to accommodate the many complaints users have about software appearing on their machines unbidden and resistant to efforts at removal.

Zango users, having installed their application under informed consent, have many opportunities to find information about the software, to file complaints, and to seek other remedies. Prior to download and/or installation, the user is able to link to information about the applications, including how they work and options for submitting questions and receiving answers.

Once installed, the Zango applications contain links from the user's computer to Zango customer support. From the user's 'tool tray', located at the bottom right of the screen, the Zango logo links provides links to:

- **Go to Library** – takes user to content library of games, video's, screensavers and utilities
- **Customer Support** – takes user directly to Web page with answers and feedback, including links to contact Zango with inquiries and/or complaints
- **License Agreement** – takes user to a locally-housed copy of the End User License Agreement (EULA) with a print function, which also contains contact links and information for customer inquiries and complaints
- **About Zango** – launches a locally-controlled window with information about Zango and a link to the Zango.com Web site

The Zango toolbar provides links to the customer inquiry and complaint mechanisms. Finally, advertisements served by the Zango program display appropriate labels (see above) that contain a link to the Customer Support Web page.

### FINDING

Zango provides nearly unavoidable access to its consumer inquiry and complaint channel, supporting e-mail inquiries and both telephone and e-mail responses. We find that Zango's implementation of a consumer complaint channel satisfies the requirements of Section IV of the agreement.

CONFIDENTIAL                                                13 DECEMBER 2006

## CONSUMER CONTROL

The FTC has long held that consumers should be the final authorities over what software runs on the personal computers that they purchase and manage. To that end, Section VII of the agreement requires that Zango provide easy-to-use and effective instructions and methods for removing its software from users' computers.

### FINDING

Zango promotes the removal of its software using the standard MS Windows utility called Add/Remove Programs. Zango fully informs users of the removal process with instructions posted in many places, including within the software applications and on the Zango Web site.

We have thoroughly tested the removal of the Zango Search Assistant and the Zango Toolbar from test machines and have found the complete and irrevocable removal of the program code in each instance. Thus, we find Zango compliant with the agreement's requirements in Section VII.

## AFFILIATE CONTROLS

The agreements specifies a range of requirements, consistent with the requirements we reviewed here, that Zango must meet when engaging affiliates in the distribution of their software. Because Zango has terminated all affiliate relationships, these requirements require no review at this time.

Exhibit B   Page 25

CONFIDENTIAL 13 DECEMBER 2006

# APPENDIX

**User Consent Interface Screen A at www.zango.com**



User clicks "No" button, which pops another dialogue



User clicks "Cancel" button and returns to Zango Content Library.

Exhibit B Page 26

CONFIDENTIAL    13 DECEMBER 2006

**User Consent Interface Screen B at www.zango.com**



Same sequence as noted in Screen A above

Exhibit B Page 22

CONFIDENTIAL 13 DECEMBER 2006

User Consent Interface Screen at Partner site at www.1UO.net



Exhibit B Page 28

**User Consent Interface Screen at Partner site at www.cheatgenius.co.uk**



Exhibit B Page 29

CONFIDENTIAL                                                13 DECEMBER 2006

**User Consent Interface Screen at Partner site at www.newgrounds.com**





Exhibit B Page 30

# ORIGINAL

Sunbelt Software
33 N. Garden Ave.
Suite 1200
Clearwater, FL 33755

*Comment 3*
FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS
DEC 5 2006
0523/30
SECRETARY

4 Dec. 2006

Federal Trade Commission,
Office of the Secretary
Room H-135
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

**RE: Additional Comments on Proposed Settlement with Zango, Inc.**

Last month we submitted comments regarding the FTC's proposed settlement with
Zango, Inc. Since we submitted our original set of comments, other disturbing Zango
installations have come to light – installations that the FTC should know about when
considering the Zango settlement. Enclosed is an additional set of comments that
addresses these new installations.

If the FTC requires more information about the installations discussed in these
comments, we encourage you to contact us directly:

   Ben Edelman
   ben@benedelman.org

   Eric Howes
   ehowes@sunbelt-software.com

We would also encourage the FTC to consult the several online reports referenced in the
comments themselves.

Best regards,

{

Eric L. Howes
Director of Malware Research


Exhibit C Page 31

# ORIGINAL



FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS

DEC  5 2006

SECRETARY

# Additional Comments on Improper Zango Practices

## Ben Edelman and Eric Howes
December 3, 2006

Last month we submitted comments regarding the FTC's proposed settlement with Zango, Inc. We flagged numerous ongoing installations that, in our judgment, show Zango in violation of the terms of the settlement –raising serious questions about "the efficacy and viability of the FTC's proposed settlement as well as Zango's ability to meet the requirements of the settlement." Since we submitted our original set of comments, other disturbing Zango installations have come to light. These new Zango installations are predicated on deceptive practices involving a MySpace worm which, in addition to seizing users' MySpace passwords, also sends users to web pages hosting videos that install Zango's software (through the deceptive license acquisition process that we previously critiqued).

These new Zango installs are disturbing not because they put Zango in violation of the terms of proposed, but precisely because they do not -- because these installations, disturbing though they may be, do not clearly violate any of the settlement's requirements . Inasmuch as these new installations are not in direct violation of the settlement's terms, they raise the alarming prospect that this settlement could allow Zango to continue to pay distributors to create malicious and/or deceptive software and web pages.

### The MySpace Worm & Zango Installs

Numerous reports confirm large numbers of MySpace seeing their MySpace profiles compromised by a JavaScript worm. Analysis confirmed that the worm spreads from infected MySpace profiles to the profiles of other users who happen to visit infected profiles or who include those infected profiles in their own MySpace "Friends" lists. References:

GhettoWebMaster. "MySpace Worm: Phishing Accounts and Spreading Zango Porn."
http://www.ghettowebmaster.com/code/myspace-phishing-zango-porn-worm/

SpywareGuide.com (Facetime). "Myspace Phish Attack Leads Users to Zango Content."
http://blog.spywareguide.com/2006/12/myspace_phish_attack_leads_use.html

Paperghost. "Phishing attack on Myspace leads to....Zango videos."
http://www.vitalsecurity.org/2006/12/phishing-attack-on-myspace-leads.html

F-Secure. "New Myspace worm using a Quicktime exploit."
http://www.f-secure.com/weblog/archives/archive-122006.html#00001038

These practices are remarkably deceptive. The worm uses a QuickTime feature to overlay injected links to fake login forms ("phishes") that appear to come from MySpace itself. Furthermore, the worm sends spam directing recipients to a site hosting pornographic videos that attempt to install Zango's software through the deceptive "license acquisition" process we previously described.

Exhibit C  Page 32

## Implications of These Deceptive Installations on Zango's Practices and the Proposed FTC Settlement

These deceptive installations crisply present a serious question of FTC policy: May Zango continue to receive installations predicated on user deception, if those installations satisfy the notice and consent procedure set out in the proposed settlement?

We think such installations ought not be permitted. We think consumers cannot grant meaningful, informed consent when an installation is predicated on a worm or a phish. Furthermore, we think consumers cannot grant meaningful consent when installation is solicited by pretending to be an authorized banner advertiser on Google (as in our prior comment's Section G spyware injection example) or by pretending to be Youtube (as in our Section G typosquatter example).

Yet we anticipate that Zango will argue that any installs perpetrated through this MySpace scheme (or the Section G examples we previously documented) are legitimate and permissible because Zango's S3 screen was displayed, containing required notice and disclosure text. Zango will claim that even if consumers were directed to the Zango-sponsored videos through deceptive means, that deception was cured by the presence of the S3 screen. We worry that the proposed settlement does little to prevent such an argument and, indeed, effectively endorses it.

We believe the FTC's proposed settlement with Zango is fatally flawed because it fails to address these deceptive Zango installs -- installs that lie at the heart of ongoing deceptive installations of Zango's software. We think a cure to this defect lies in prior FTC caselaw, namely the "deceptive door opener" line of cases (e.g. *Federal Trade Commission v. Encyclopaedia Britannica*, Inc., 87 F.T.C. 421 (1976)). We think these cases are squarely on point. Where Zango's initial contact with a consumer occurs through deception, as set out above, we think the deception cannot be cured. We think the FTC could appropriately add language to that effect to its proposed settlement with Zango – reiterating that materially deceptive installations, by Zango or by its distributors, cannot be corrected merely through the notice and consent procedure otherwise set out in the proposed settlement.

More generally, we continue to doubt that Zango can supervise its distributors ("affiliates") with sufficient rigor to assure that distributors' practices are honest, ethical, and appropriate. If Zango cannot adequately supervise its distributors, the FTC may have no choice but to insist that Zango cease operating through distributors.

Finally, so long as these deceptive installations continue, we believe further monetary penalties are needed. Zango ought not retain whatever profits it earned from these deceptive installations. We think the FTC should require Zango to disgorge all such profits, and to forfeit these improper installations (via automatic uninstallation of all Zango software that was installed improperly).

Sunbelt Software
33 N. Garden Ave.
Suite 1200
Clearwater, FL 33755

22 Nov. 2006

Federal Trade Commission,
Office of the Secretary
Room H-135
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

**RE: Comments on Proposed Settlement with Zango, Inc.**

Enclosed is a set of comments from Ben Edelman and Eric Howes on the FTC's
proposed settlement with Zango, Inc. An online version of these comments is available:

   http://www.benedelman.org/news/112006-1.html

The online version contains links to supporting video evidence as well as larger versions
of the graphics included in the print comments submitted here.

Mr. Edelman and I are encouraged by the FTC's interest in soliciting public comments on
this settlement, which has potentially serious implications both for the adware and online
advertising industries as well as for consumers.

If the FTC requires more information about the example installations discussed in these
comments, we encourage you to contact us directly:

   Ben Edelman
   ben@benedelman.org

   Eric Howes
   ehowes@sunbelt-software.com

Best regards,

(

Eric L. Howes
Director of Malware Research

Exhibit C Page 34

# Bad Practices Continue at Zango, Notwithstanding Proposed FTC Settlement and Zango's Claims

**By Ben Edelman and Eric Howes**
November 20, 2006

Earlier this month, the FTC announced[1] the proposed settlement of its investigation into Zango[2], makers of advertising software widely installed onto users' computers without their consent or without their informed consent (among other bad practices).

We commend the proposed settlement's core terms. But despite these strong provisions, bad practices continue at Zango -- practices that, in our judgment, put Zango in violation of the key terms and requirements of the FTC settlement. We begin by explaining the proposed settlement's requirements. We then present eight types of violations of the proposed settlement, with specific examples of each. We conclude with recommendations and additional analysis.

Except where otherwise indicated, this document describes only downloads we tested during November 2006 -- current, recent installations and behaviors.

## Zango's Burdens Under the Proposed FTC Settlement

The FTC's proposed settlement with Zango imposes a number of important requirements and burdens on Zango, including Zango's installation and advertising practices. Specifically, the settlement:

- Prohibits Zango from using "any legacy program to display any advertisement to, or otherwise communicate with, a consumer's computer." (settlement I)
- Prohibits Zango from (directly or via third parties) "exploit[ing] a security vulnerability ... to download or install onto any computer any software code, program, or content." (II)
- Prohibits from Zango installing software onto users' computers without "express consent." Obtaining "express consent" requires "clearly and prominently disclos[ing] the material terms of such software program or application prior to the display of, and separate from, any final End User License Agreement." (III) Defines "prominent" disclosure to be, among other requirements, "unavoidable." (definition 5)
- Requires Zango to "provide a reasonable and effective means for consumers to uninstall the software or application," e.g. through a computers' Add/Remove utility. (VII)
- Requires Zango to "clearly and prominently" label each advertisement it displays. (VI)

These are serious burdens and requirements that, were they zealously satisfied by Zango, would do much to protect consumers from the numerous nonconsensual and misleading Zango installations we have observed.

## Zango Is Not In Compliance with the Proposed Settlement

Zango has claimed that it "has met or exceeded the key notice and consent standards detailed in the FTC consent order since at least January 1, 2006."

Despite Zango's claim, we continue to find ongoing installations of Zango's software that fall far short of the proposed settlement's burdens, requirements, and standards. The example installations that we present below

Exhibit C Page 35

establish that Zango's current installation and advertising practices remain in violation of the terms and requirements of the proposed settlement.

- **"Material Terms" Disclosed Only in EULA**
  Zango often announces "material terms" only in its End User License Agreement, not in the more prominent locations required by the proposed settlement. (Examples A, B)
- **"Material Terms" Omitted from Disclosure**
  Zango often omits "material terms" from its prominent installation disclosures -- failing to prominently disclose facts likely to affect consumers' decisions to install Zango's software. (Examples A, B, C)
- **Disclosures Not Clear & Prominent**
  Zango presents disclosures in a manner and format such that these disclosures fail to gain the required "express consent" of users because the disclosures are not "clearly and prominently" displayed. (Examples B, E, F)
- **Disclosures Presented Only After Software Download & Execution**
  Zango presents disclosures only after the installation and execution of Zango's software on the users' computers has already occurred, contrary to the terms of the proposed settlement. (Examples C, F)
- **No Disclosure Provided Whatsoever**
  Some Zango software continues to become installed with no disclosure whatsoever. (Example D)
- **Installation & Servicing of Legacy Programs**
  Older versions of Zango's software -- versions with installation, uninstallation, and/or disclosure inconsistent with the proposed settlement -- continue to become installed and to communicate with Zango servers. (Examples C, D, E, F)
- **Installations Promoted & Performed through Miscellaneous Other Deceptive Means & Circumstances**
  Zango installs are still known to be promoted and performed in a variety of miscellaneous practices that can only be characterized as deceptive. (Multiple examples in section G)
- **Unlabeled Advertising**
  Some Zango advertisements lack the labeling required by the proposed settlement. (Multiple examples in section H)

These improper practices remain remarkably easy to find, and we have numerous additional recent examples on file. Moreover, these problems are sufficiently serious that they cast doubt on the efficacy and viability of the FTC's proposed settlement as well as Zango's ability to meet the requirements of the settlement.

## Example A:    Zango's Ongoing Misleading Installations On and From Its Own Servers

The proposed settlement requires "express consent" before software may be "install[ed] or "download[ed]" onto users' PCs (III). The term "prominent" is defined to mean "clear[] and prominent[]" disclosure of "the material terms" of the program to be installed, and most of Zango's recent installation disclosures seem to meet this standard. But we are concerned by what those disclosures say. In our view, the disclosures omit the material facts Zango is obliged to disclose.

Although the proposed settlement does not explain what constitute "material" terms, other FTC authority provides a definition. The FTC's Policy Statement on Deception, holds that a material fact is one "likely to affect the consumer's conduct or decision with regard to a product or service." [3]

From our analysis of Zango's software, we think Zango has two material features -- two features particularly likely to affect a reasonable user's decision to install (or not install) Zango software. First, users must know that Zango will give them extra pop-up ads -- not just "advertisements," but pop-ups that appear in separate, freestanding windows. Second, users must know that Zango will transmit detailed information to its servers, including information about what web pages they view, and what they search for.

Exhibit C   Page 36

Unfortunately, many of Zango's installations fail to include these disclosures with the required prominence. Consider the screen shown below.



Figure 1: A Misleading Zango Installer Appearing Within Windows Media Player

Here, Zango admits that it shows "advertisements," but Zango fails to disclose that its ads appear in pop-ups. Zango's use of the word "advertisements," with nothing more, suggests that Zango's ads appear in standard advertising formats -- formats users are more inclined to tolerate, like ordinary banner ads within web pages (e.g. the ads at nytimes.com) or within other software programs (e.g. the ads in MSN Messenger). In fact Zango's pop-up ads are quite different, in that they appear in pop-ups known[4] to be particularly annoying and intrusive. But the word "advertisements" does nothing to alert users to this crucial fact.

Zango also fails to disclose that its servers receive detailed information about users' online behavior. Zango tell users that ads are "based on" users' browsing. But this disclosure is not enough, because it omits a material fact. In particular, the disclosure fails to explain that users' behavior will be transmitted to Zango, a fact that would influence reasonable users' decision to install Zango.

We're also concerned about the format and circumstances of these installation screens. Zango's installation request appears in a Windows Media "license acquisition" screen -- a system Microsoft provides for bona fide license acquisition, not for the installation of spyware or adware. Zango's installer appears within Windows Media Player -- a context where few users will expect to be on the lookout for unwanted advertising software, particularly when users had merely sought to watch a video, not to install any software whatsoever. Furthermore, the button to proceed with installation is misleadingly labeled "Play Now" -- not "I Accept," Install," or any other caption that might alert users to the consequences of pressing the button. The screen's small size further adds to user confusion: At just 485 by 295 pixels, the window doesn't have room to explain the material effects of Zango's software, even with Zango's extra-small font. (In Zango's main disclosure, capital letters are just seven pixels tall.) Furthermore, a user seeking to read Zango's EULA (as embedded in these installation screens) faces a remarkable challenge: The 3,033 word document is shown in a box just five lines tall, therefore requiring fully 53 on-screen pages to view in full. Finally, if a user ultimately presses the "Play Now " button, then the "Open" button on the standard Open/Save box that follows, Zango installs immediately, without any further opportunity for users to learn more or to change their mind. Such a rapid installation is contrary to standard Windows convention of further disclosures within an EXE installer, providing further opportunities for users to learn more and to change their minds.[5]

Exhibit C Page 37

Edelman & Howes: "Bad Practices Continue at Zango"                                                    4

All in all, we think typical users would be confused by this screen — unable to figure out who it comes from, what it seeks to do, or what exactly will occur if they press the Play Now button. A more appropriate installation sequence would use a standard format users better understand (e.g. a web page requesting permission to install), would tell users far more about the software they're receiving, and would label its buttons far more clearly.

These installations are under Zango's direct control: They are loaded directly from Zango's servers. Were Zango so inclined, it could immediately terminate this installation sequence, or it could rework these installations, without any cooperation with (or even requests to) its distributors.

### Example B:     Zango's Ongoing Misleading Hotbar Installations On and From Its Own Servers

The "express consent" required under the proposed settlement applies not just to software branded as "Zango," but also to all other software installed or downloaded by Zango. (See "any software" in section III.) The "express consent" requirement therefore applies to Hotbar-branded software owned by Zango as a result of Zango's recent merger with Hotbar. But Hotbar installations fail to include unavoidable disclosures of material effects, despite the requirements in the proposed settlement.

Consider the Hotbar installation shown in a video available online[6] and in the three screenshots below.



Figure 2: Hotbar's Initial Installation Solicitation - Silent as to Hotbar's Effects



Figure 3: Hotbar's ActiveX Installer - Without Disclosure of Material Effects

Exhibit C   Page 38

Edelman & Howes: "Bad Practices Continue at Zango"                                                       5



Figure 4: Final Step in Hotbar Installation - No Cancel Button, No Disclosure of Material Effects

The installation sequence begins with an ad offering "free new emotion icons" (first screenshot at right) –– certainly no disclosure of the resulting advertising software, the kinds of ads to be shown, or the significant privacy effects. If a user clicks that ad, the user receives the second screenshot at right -- a bare ActiveX screen, again lacking a substantive statement of material effects of installing. If the user presses Yes in the ActiveX screen, the user receives the third screen at right – disclosing some features of Hotbar (e.g. weather, wallpapers, screensavers), and vaguely admitting that Hotbar is "ad supported," but saying nothing whatsoever about the specific types of ads (e.g. intrusive in-browser toolbar animations) nor the privacy consequences. Furthermore, this third screen lacks any button by which users can decline or cancel installation. (Note the absence of any "cancel" button, or even an "x" in the upper-right corner.)

This installation sequence is substantially unchanged from what Edelman reported in May 2005.[7]

This installation lacks the unavoidable material disclosures required under the proposed settlement. We see no way to reconcile this installation sequence with the requirements of the proposed settlement.

## Example C:    Incomplete, Nonsensical, and Inconsistent Disclosures Shown by Aaascreensavers

We also remain concerned about third parties installing Zango's software without the required user consent. Zango's past features a remarkable serious of bad-actor distributors, from exploit-based installers[8] to botnets[9] to faked consent.[10] Even today, some distributors continue to install Zango without providing the required "clear and prominent" notice of "material" effects.

Consider an installation of Zango from Aaascreensavers.com. Aaascreensaver s provides a generic "n-Case" installation disclosure that says nothing about the specifics of Zango's practices -- omitting even the word "advertisements," not to mention "pop-ups" or privacy consequences. (See first screenshot below.) Furthermore, Aaascreensavers fails to show or even reference a EULA for Zango's software. Nonetheless, Aaascreensavers continues to place Zango software onto users' PCs through these installers.

Exhibit C  Page 39



Figure 5: Aaascreensavers' Initial Zango Prompt - Omitting Key Material Information



Figure 6: Zango's Subsequent Screen -- with deficiencies set out in the text below

Particularly striking is the nonsensical screen that appears shortly after Aaascreensavers installs Zango. (See second screenshot above.) Beneath a caption labeled "Setup," the screen states "the content on this site is free, thanks to 180search Assistant" -- although the user has just installed a program (and is not browsing a site), and the program the user (arguably) just agreed to install was called "n-Case" not "180search Assistant." At least as paradoxically, the "Setup" screen asks users to choose between "Uninstall[ing] 180search Assistant" and "Keep[ing]" the software. Since "180search Assistant" is software reasonable users will not even know they have, this choice is particularly likely to puzzle typical users. After all, it is nonsense to speak of a user making an informed decision to "keep" software he didn't know he had.

Crucially, both installation prompts omit the material information Zango must disclose under its settlement obligations: Neither prompt mentions that ads will be shown in pop-ups, nor do they mention the important privacy effects of installing Zango software.[11]

Exhibit C Page 40

**Example D:    Msnemotions Installing Zango with No Disclosure At All**

Msnemotions continues to install Zango software with no disclosure whatsoever. In particular, Msnemotions never shows any license agreement, nor does it mention or reference Zango in any other on-screen text, even if users fully scroll through all listings presented to them.[12]

This installation is a clear violation of section III of the proposed FTC settlement. That section prohibits Zango "directly, or through any person [from] install[ing] or download[ing] ... any software program or application without express consent." Here, no such consent was obtained, yet Zango software downloaded and installed anyway.

In our tests, this Zango installation did not show any ads (although it did contact a Zango server and download a 20MB file). Nonetheless, the violation of section III occurs as soon as the Zango software is downloaded onto the user's computer, for lack of the requisite disclosure and consent.

**Example E:    Emomagic Installing Zango with an Off-Screen Disclosure**

Emomagic continues to install Zango software with a disclosure buried five pages within its lengthy (23 on-screen-page) license agreement. That is, unless a user happened to scroll to at least the fifth page of the Emomagic license, the user would not learn that installing Emomagic installs Zango too.[13]



Figure 7: Emomagic First Mentions Zango 5 Pages Down In Its EULA

This installation is a clear violation of the proposed FTC settlement, because the hidden disclosure of Zango software is not "unavoidable." In contrast, the proposed Settlement's provision III and definition 5 define "prominent" disclosures to be those that are unavoidable, among other requirements.

We have additional examples on file where the first mention of Zango comes as far as 64 pages into a EULA presented in a scroll box. See also example F, below, where Zango appears 44 pages into a EULA, after the GPL.

Exhibit C Page 41

Edelman & Howes: "Bad Practices Continue at Zango"                                    8

**Example F:    Warez P2P Speedup Pro Installing Zango with an Off-Screen Disclosure**

Warez P2P Speedup Pro continues to install Zango software with a disclosure buried 44 pages within its lengthy license agreement.[14] Users are unlikely to see mention of Zango in part because Zango's first mention comes so far down within the EULA.

Users are particularly unlikely to find Zango's EULA because the first 43 pages of the EULA scroll box show the General Public License (GPL). (See the screenshot of the first page below, giving no suggestion that anything but the GPL appears within the scroll box.)



Figure 8: First page of Warez P2P Speedup Pro EULA shows only the GPL



Figure 9: Warez P2P First Mentions Zango at Page 44 of its EULA, Below the GPL

Exhibit __C__ Page __42__

Edelman & Howes: "Bad Practices Continue at Zango"                                                    9

Sophisticated users may already be familiar with this license, which is known for the many rights it grants to users and independent developers. Recognizing this pro-consumer license, even sophisticated users are discouraged from reviewing the scroll box's contents in full -- making it all the less likely that they will find the Zango license further down (shown in the second screenshot above).

After installation, Warez P2P Speedup Pro proceeds to the second screen shown in Example C, above. A video available online[15] confirms the special deceptiveness of this screen: If a user chooses the "uninstall" button -- exercising his option (however deceptively mislabeled) to refuse Zango's software -- the user then receives a further screen attempting to get the user to change his mind and accept installation after all.



Figure 10: Further Zango Screen Deceptively Confirms User's Desire to "Cancel" the Installation

The substance of this screen is especially deceptive -- asking the user whether he wants to "cancel," when in fact he had never elected even to start the Zango installation sequence in the first place. Finally, if the user presses the "Exit Setup" button on that final screen, the user is told he must restart his computer -- a particularly galling and unnecessary interruption.



Figure 11: User is Prompted to Restart Computer

## Section G:   Zango Installations Predicated on Consumer Deception or on Use of Other Vendors' Spyware

We have also observed Zango installs occurring subsequent to consumer deception or other vendors sending spyware-delivered traffic to Zango.

*Fullcontext spyware promoting Zango.* We have observed Fullcontext spyware (itself widely installed without consent) injecting Zango ads into third parties' web sites. Through this process, Zango ads appear without the permission of the sites in which they are shown, and without payment to those sites. These ads even appear in places in which no banner ads are not available for purchase at any price. See e.g. the screenshot below, showing a Zango banner ad injected to appear above Google's search results.

Exhibit C  Page 43

Edelman & Howes: "Bad Practices Continue at Zango"                                10



Figure 12: A Zango Ad Injected into Google by FullContext

*Typosquatters promoting Zango.* Separately, Chris Boyd recently documented[16] Zango installs commencing at "Yootube". "Yootube" is a clear typosquat on the well-known "Youtube" site -- hoping to reach users who mistype the address of the more popular site. If users reach the misspelled site, they will be encouraged to install Zango. Such Zango installations are predicated on a typosquat, e.g. on users reaching a site other than what they intended -- a particularly clear example of deception serving a key role in the Zango installation process.

*Spyware bundlers promoting Zango.* In our testing of summer and fall 2006, we repeatedly observed Zango "S3" installer programs downloaded onto users' computers by spyware-bundlers themselves operating without user consent (e.g. DollarRevenue and TopInstalls). Users received these Zango installation prompts among an assault of literally dozens of other programs. Any consent obtained through this method is predicated on an improper, nonconsensual arrival onto users' PCs -- a circumstance in which we think users cannot grant informed consent. Furthermore, the proposed settlement requires "express consent" before "installing or downloading" (emphasis added) "any software" onto users' PCs (section III). Zango's S3 installer is a "software program" within the meaning of the proposed settlement, yet DollarRevenue and TopInstalls downloaded this program onto users' computers without consent. So these downloads violate the plain language of the proposed settlement, even where users ultimately refuse to install Zango software.

## Section H: Unlabeled Ads

Today CDT will file a further comment about the FTC's proposed settlement, focusing in part on Zango's recent display of unlabeled ads, again specifically contrary to Zango's obligations under the proposed settlement (section VI). CDT has proof of 39 unlabeled ads -- 10% of their recent partially-automated tests -- in which Zango's pop-up ads lacked the labeling required under the proposed settlement. CDT explains that the ads "provide[d] absolutely no information that would allow consumers to correlate the advertisements' origins to Zango's software."

We share CDT's concern, because we too have repeatedly seen these problems. For example, a video available online[17] shows a Zango ad served on November 19, 2006 -- with labeling that disappears after less than four seconds on screen (from 0:02 to 0:06 in the video). Furthermore, Edelman first reported[18] this same problem in July 2004: That when ads include redirects (as many do), Zango's labeling often disappears. Compliance with

Exhibit C Page 99

the proposed settlement requires that Zango's labeling appear on each and every ad, not just on some of the ads or even on most of the ads. So, here too, Zango is in breach of the proposed settlement.

Furthermore, the proposed settlement's labeling requirement applies to "any advertisement" Zango serves -- not just to Zango's pop-ups, but to other ads too. Zango's toolbars show many ads, as depicted in the screenshots below. Yet these toolbars lack the labeling and hyperlinks required by the proposed settlement. These unlabeled toolbars therefore constitute an additional violation of Zango's duties under the proposed settlement.



Figures 13-16: Zango/Hotbar Toolbars Without the Labeling Required under the Proposed Settlement

## The Size of Zango's Payment to the FTC

We are puzzled by the size of the cash payment to be made by Zango. We understand that the FTC's authority is limited to reclaiming ill-gotten profits, not to extracting penalties.[19] But we think Zango's profits to date far exceed the $3 million payment specified in the proposed settlement.

Available evidence suggests Zango's company-to-date profits are substantial, probably beyond $3 million. As a threshold matter, Zango's business is large: Zango claims[20] to have 20 million active users at present (albeit with some "churn" as users manage to uninstall Zango's software). Furthermore, Zango's revenues are large: Zango recently told a reporter of daily revenues of $100,000[21] (i.e. $36 million per year), a slight increase from a 2003 report of $75,000 per day.[22] With annual revenues on the order of $20 to $40 million, and with three years of operation to date, we find it inconceivable that Zango has made only $3 million of profit.

Zango's prior statements and other companies' records also both indicate that Zango's profits exceed $3 million. A 2005 Forbes article[23] confirms high profits at Zango, reporting "double-digit percentage growth in profits" -- though without stating the baseline level of profits. But financial records[24] from competing "adware" vendor Direct Revenue indicate[25] a remarkable 75%+ profit margin: In 2004, DR earned $30 million of pre-tax profit on $38 million of revenue. Because Zango's business is in many respects similar to DR, Zango's profit margin is also likely to be substantial, albeit reduced from the 2004-era "adware" peak. Even if Zango's profit margin were an order of magnitude lower, i.e. 7%, Zango would still have earned far more than $3 million profits over the past several years.

If Zango's profits substantially exceed $3 million, as we think they do, the settlement's payment is only a slap on the wrist. A tougher fine -- such as full disgorgement of all company-to-date profits worldwide -- would better send the message that Zango's practices are and have been unacceptable.

## Zango's Statements and the Need for Enforcement

In its November 3 press release[26], Zango claims its reforms are already in place. "Every consumer downloading Zango's desktop advertising software sees a fully and conspicuously disclosed, plain-language notice and consent process," Zango's press release proclaims. This claim is exactly contrary to the numerous examples we present above. Zango further claims that it "has met or exceeded the key notice and consent standards detailed in the FTC consent order since at least January 1, 2006" -- again contrary to our findings that nonconsensual and deceptive installations remain ongoing.

Exhibit C Page 45

Edelman & Howes: "Bad Practices Continue at Zango"    12

From the FTC's press release[27] and from recent statements of FTC commissioners and staff, it appears the FTC intends to send a tough message to makers of advertising software. We commend the FTC's goal. The proposed settlement, if appropriately enforced, might send such a message. But we worry the FTC will send exactly the opposite message if it allows Zango to claim compliance without actually doing what the proposed settlement requires.

As a first step, we endorse CDT's suggestion that the FTC require Zango to retract its claim of compliance with the proposed settlement. Zango's statement is false, and the FTC should not stand by while Zango mischaracterizes its behavior vis-a-vis the proposed settlement.

More broadly, we believe intensive ongoing monitoring will be required to assure that Zango actually complies with the settlement. We have spent 3+ years following Zango's repeated promises of "reform," and we have first-hand experience with the wide variety of techniques Zango and its partners have used to place software onto users' PCs. Testing these methods requires more than black-letter contracts and agreements; it requires hands-on testing of actual infected PCs and the scores of diverse infection mechanisms Zango's partners devise. To assure that Zango actually complies with the agreement, we think the FTC will need to allocate its investigatory resources accordingly. We've spent approximately 10 hours on the investigations leading to the results above, and we've uncovered these examples as well as various others. With dozens or hundreds of hours, we think we could find many more surviving Zango installations in violation of the proposed settlement's requirements. We think the FTC ought to find these installations, or require that Zango do so, and then ought to see that the associated files are entirely removed from the web.

Exhibit C  Page 46

Edelman & Howes: "Bad Practices Continue at Zango"                                    13

## End Notes

1. Federal Trade Commission. "Zango, Inc. Settles FTC Charges." 3 Nov. 2006. <http://www.ftc.gov/opa/2006/11/zango.htm>.

2. Federal Trade Commission. "In the Matter of Zango, Inc. f/k/a 180Solutions, Inc.,..." 3 Nov. 2006 <http://www.ftc.gov/os/caselist/0523130/>.

3. Federal Trade Commission. "FTC Policy Statement On Deception." 14 Oct. 1983. <http://www.ftc.gov/bcp/policystmt/ad-decept.htm>.

4. "The Most Hated Advertising Techniques." *Jakob Nielsen's Alertbox* 6 Dec. 2004. <http://www.useit.com/alertbox/20041206.html>.

5. See the HTML version of these comments for a video capture of the installation sequence: http://www.benedelman.org/news/112006-1.html

6. See the HTML version of these comments for a video capture of the installation sequence: http://www.benedelman.org/news/112006-1.html

7. Ben Edelman. "Hotbar Installs via Banner Ads at Kids Sites." 16 May 2005. <http://www.benedelman.org/spyware/installations/kidzpage-hotbar/>.

8. Ben Edelman. "Who Profits from Security Holes?" 18 Nov. 2004. <http://www.benedelman.org/news/111804-1.html>.

9. Gregg Keizer. "Adware Purveyor Claims Extortion By Own Distributor." *TechWeb.com* 3 Nov. 2005. <http://www.techweb.com/wire/security/173402770>.

10. Ben Edelman. "Nonconsensual 180 Installations Continue, Despite 180's "S3" Screen." 20 Feb. 2006. <http://www.benedelman.org/news/022006-1.html>.

11. See the HTML version of these comments for a video capture of the installation sequence: http://www.benedelman.org/news/112006-1.html

12. See the HTML version of these comments for video proof: http://www.benedelman.org/news/112006-1.html

13. See the HTML version of these comments for video proof: http://www.benedelman.org/news/112006-1.html

14. See the HTML version of these comments for video proof: http://www.benedelman.org/news/112006-1.html

15. See the HTML version of these comments for a video capture of the installation sequence: http://www.benedelman.org/news/112006-1.html

16. Christopher Boyd. "Zango and the fake Yootube Movies." *VitalSecurity.org* 7 Nov. 2006. <http://www.vitalsecurity.org/2006/11/zango-and-fake-yootube-movies.html>.

17. See the HTML version of these comments for video proof: http://www.benedelman.org/news/112006-1.html

18. Ben Edelman. Forum comment. *ABestWeb.com* 9 Jul. 2004 <http://forum.abestweb.com/showpost.php?p=73272&postcount=14>.

Exhibit C Page 47

Edelman & Howes: "Bad Practices Continue at Zango"                                    14

19. Roy Mark. "FTC Mulling Next-Gen Tech, Policy." *InternetNews.com* 6 Nov. 2006 <http://www.
    internetnews.com/bus-news/article.php/3642206>.

20. Zango. "Zango Expands Library of Online PC Games." *Zango.com* 27 Aug. 2006
    <http://www.zango.com/Destination/ Corporate/ReadArticle.aspx?id=52>.

21. Brian Krebs. "An Interview with 180solutions' CEO." *SecurityFix* 17 Feb. 2006 <http://blog.
    washingtonpost.com/securityfix/2006/02/a_interview_with_180solutionss.html>.

22. Bob Sullivan. "Pop-ups Prove Profitable, Persistent." *MSNBC.com* 20 Nov. 2003. <http://www.msnbc.
    msn.com/id/3541497/>.

23. Ellyn Spragins. "The Talent Pool." *CNNMoney.com* 1 Oct. 2005. <http://money.cnn.com/magazines/fsb/
    fsb_archive/2005/10/01/8357491/index.htm>.

24. Ben Edelman. "People of the State of New York v. Direct Revenue, LLC - Documents and Analysis." 7 Apr.
    2006. <http://www.benedelman.org/spyware/nyag-dr/>.

25. Alex Eckelberry. "Money, Money, Money." *SunbeltBlog* 8 Apr. 2006. <http://sunbeltblog.bbgspot.com/
    2006/04/money-money-money.html>.

26. Zango. "Zango Response to FTC Settlement Agreement Announcement." *Zango.com* 2 Nov. 2006
    <http://www.zango.com/Destination/Corporate/ReadArticle.aspx?id=55>.

27. Federal Trade Commission. "Zango, Inc. Settles FTC Charges." 3 Nov. 2006, <http://www.ftc.gov/opa/
    2006/11/zango.htm>.

Exhibit C Page 48



Office of the Secretary

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

March 7, 2007

Mr. Eric Howes
Director of Malware Research
Sunbelt Software
33 N. Garden Avenue
Suite 1200
Clearwater, FL 33755

> Re:   Zango, Inc., f/k/a 180solutions, Inc., Keith Smith, and Daniel Todd
>       FTC Matter No. 0523130

Dear Mr. Howes:

Thank you for the comments you submitted on behalf of yourself and Ben Edelman, dated November 22 and December 4, 2006, regarding the above-referenced matter. Your comments were placed on the public record pursuant to Section 2.34 of the Commission's Rules of Practice, 16 C.F.R. § 2.34, and were given serious consideration by the Commission.

### The November 22, 2006 Comments

In your November 22 comments, you commend the proposed settlement's "core terms," but raise concerns regarding future enforcement based on recent examples of conduct that purportedly would violate the settlement. Accordingly, you assert that "intensive ongoing monitoring will be required to assure that Zango actually complies with the settlement." In addition, you contend that Zango's profits were greater than $3 million, and suggest that the settlement payment is insufficient.

The Commission recognizes that it must be vigilant regarding Zango's conduct once the proposed order becomes final. Indeed, the proposed order itself requires Zango to promptly and completely investigate consumer complaints. The Commission encourages both you and Mr. Edelman to keep the staff apprised of any possible order violations.

Your characterization of the $3 million disgorgement as insufficient is based primarily on speculation regarding Zango's gross revenues and the purported profit margins of unrelated adware companies. While the Commission is not at liberty to disclose the specifics of the analysis because it was based on confidential financial information provided to the staff, the Commission has determined that the $3 million disgorgement amount is appropriate based on all of the information before it.


Exhibit ___ Page ___

Mr. Eric Howes
Page 2

### The December 4, 2006 Additional Comments

You submitted your December 4 "additional comments" because "other disturbing Zango installations have come to light." Specifically, the additional comment refers to a recent incident where a worm exploit caused a phishing attack on the MySpace.com website that directed users to a website containing pornographic videos – some of which required an installation of Zango adware to view.

Your additional comments recognize that consumers were provided proper notice and consent before Zango's adware was installed, but contend that the proposed order is insufficient because the conduct of unrelated third parties – regardless of whether Zango had knowledge or control of the conduct – is not covered by the proposed order. Accordingly, your comments propose that the consent order should be revised to address any materially deceptive conduct that leads to a Zango installation.

As you have characterized it, the third-party conduct that ultimately led to the above-referenced installations is potentially unfair or deceptive. The proposed consent order with Zango, however, remedies the Commission's allegations that Zango caused its software to be downloaded on consumers' computers without adequate notice and consent and remedies Zango's previous unfair uninstallation practices, which are the principal problems the staff identified in its investigation. Accordingly, the proposed order appropriately addresses the conduct the Commission challenged and fences in reasonably related conduct. It is not intended to cover every *potential* violation of Section 5 by Zango. The Commission retains the ability to bring a *de novo* Section 5 action, for example, if it determines that Zango is engaging or participating with its distributors in conduct that deceives consumers into downloading Zango's software notwithstanding the notice and consent required by this Order.

After considering your comments, the Commission has determined that the public interest would best be served by issuing the Decision and Order in final form without modification. Respondents will be required to file compliance reports with the Commission, and will be subject to potentially large civil penalties if they violate the Order.

Thank you again for your comments. The Commission is aided in its analysis by hearing from a variety of sources in its work, and we appreciate your interest in this matter.

By direction of the Commission.

                                        Donald S. Clark
                                        Secretary

